## Allon v. CNA Insurance Companies

*Harold Gondelman*, for plaintiff.
*Donald J. McCormick*, for defendant.

FINKELHOR, *J.*, June 7, 1985—The above-captioned action was instituted as an action for declaratory judgment to compel defendant insurance carrier to provide no-fault insurance benefits (PIP) under the insurance policy of Natalie Ina Allon. See 40 Pa.C.S. §1009.404.

As a result of a motor vehicle accident in Kentucky and subsequent developments, Natalie Ina Allon has been comatose and in a quadriplegic state since October 12, 1980. Samuel Allon was appointed by the Kentucky court as the committee of the Estate of Natalie Ina Allon (i.e., administrator) on November 21, 1980, and represented Natalie Ina Allon in the settlement of a lawsuit instituted in Kentucky. The instant proceedings were filed under the PIP portions of the Pennsylvania No-fault Act and there is no duplication of damages. Plaintiff is insured by defendant CNA Insurance Companies.

Plaintiff Natalie Ina Allon has a Ph.D. degree and, prior to the accident, was an expert in obesity. She is presently a resident of Negley House and is allegedly comatose and quadriplegic. She is under the care of Dr. Marvin Silverblatt, who supervises her treatment. Plaintiff has also been evaluated by Dr.

Jane Phillips, board certified in physical medicine. Plaintiff has nurses around the clock, is unable to attend to her personal needs and is dependent upon the nursing staff to be fed, bathed and positioned and is without bladder or bowel control. Plaintiff has also lost speech functions. The four nurses (including the relief nurse) are three LPNs (licensed practical nurse) and one RN (registered nurse). Plaintiff also receives music and physical therapy.

Plaintiff's father, Samuel Allon, is a 77-year-old man and her mother has passed away since the accident. There are no other blood relatives besides the father, Samuel Allon.

The insurance carrier submitted the case to a rehabilitation representative from Interpose who found that "Natalie could receive adequate medical care from the nursing home staff or that other adjustments could be made to reduce the cost of nursing care." Plaintiff initially filed a petition for a preliminary injunction to continue nursing care and, by agreement of the parties, plaintiff's program was continued to September 1984. Since that date, plaintiff has not received payments for the round-the-clock nursing care.

After a two-day hearing, it is apparent that most of the facts are not in dispute. There is no dispute that defendant insurance carrier unilaterally stopped payments without hearing. There is no dispute that plaintiff is a total-care patient and, whether the treatment accorded to plaintiff is maintenance or rehabilitation, the basic fact situation is that plaintiff is unable to take care of herself and requires individual total care to maintain life.

At trial, plaintiff presented the testimony of Dr. Silberblatt, the treating physician; Dr. Jane Phillips, who evaluated plaintiff at St. Francis Hospital; the three nurses who, presently, are caring for plaintiff,

and the music therapist. Dr. Silverblatt and the treating nurses all testified to improvements noted in plaintiff's condition under her program at Negley House, including the change from tube to mouth feeding, the response of plaintiff to music, and her recognition of persons upon whom she is dependent.

It is defendant's contention that nursing care could be provided by the Negley House staff or at least by persons of less training than her present nurses.

Thus, the issue to be decided by the court is whether plaintiff requires the round-the-clock service under plaintiff's present program and whether said service must be paid by the insurance carrier.

It is axiomatic that the No-fault Act must be liberally construed in favor of the injured party. Section 103 of the act defines allowable expense to include "reasonable charges incurred for, or the reasonable value of . . . reasonably needed and used products, services and accommodations for: (A) professional medical treatment and care; (B) emergency health services; (C) medical and vocational rehabilitation services; . . . "

The act further defines medical and vocational rehabilitation services to include:

". . . services necessary to reduce disability and to restore the physical, psychological, social, and vocational functioning of a victim. Such services may include, but are not limited to, medical care, diagnostic and evaluation procedures, physical and occupational therapy, other necessary therapies, speech pathology and audiology, optometric services, *nursing care under the supervision of a registered nurse,* medical social services, vocational rehabilitation and training services, occupational licenses and tools, and transportation where neces-

sary to secure medical and vocational rehabilitation services. . . . " (Emphasis added.) 40 P.S. § 1009.103

The act further provides that, after a hearing upon application by any interested person and notice to others, the court may enter an order determining the basic-loss benefits to which plaintiff is entitled providing the cost of such procedure has or will contribute to rehabilitation and "that the cost of such procedure is reasonable in relation to its probable rehabilitative effects." 40 Pa.C.S. § 1009.405. In Wachter v. Erie Ins. Group, 10 D.&C.3d 676 (1979), the court approved a private room under the recommendation of plaintiff's treating doctor.

In Reilly v. SEPTA, 330 Pa. Super. 420; 479 A.2d 973 (1983), the Pennsylvania Superior Court discussed whether attendance at a special school was required to reduce a victim's disability and restore his functions. The trial court, in considering the evidence, discussed whether this was custodial or medical care and found that the determination of services required a new trial on the issue of damages. In Nationwide Mutual Ins. Co. v. Johnson, 130 P.L.J. 386, Del Sole, J., held that, in the absence of a court order, the No-fault Act does not authorize a carrier to suspend benefits until the claimant complies with the demand for a physical examination. In Nye v. J.C. Penney Casualty Co., 29 D.&C.3d 233 (1984), the trial court permitted the inclusion of the expenses of a special education rehabilitation program at a religiously affiliated school as an appropriate and allowable expense. Similar results were reached in a recent Wisconsin case where the Wisconsin court held that the costs of nursing home care was properly recoverable and that defendant acted in bad faith in denying such coverage. Poling v. Wisconsin Physicians Service, Pierce Co. Circuit Ct., no. 82-CV-212 (1983).

It is clear that in the instant case there is a question of fact as to whether or not plaintiff has reached a plateau of recovery and whether further treatment will not rehabilitate plaintiff into a major recovery. However, bearing in mind the hopes of the father and nursing staff for plaintiff's recovery, there is no question that plaintiff still remains a total-care case and requires skilled nursing care to maintain life. It is not necessary to determine whether or not a nursing aide should be trained to replace the current LPNs. However, there is no question that plaintiff cannot take care of herself and requires additional medical and nursing services for survival.

Based upon the above discussion, it is our belief that the carrier was in error in unilaterally cutting off medical payments and that the projected change in treatment to reduce personnel is not realistic in view of plaintiff's present physical condition.

Plaintiff is claiming $84,155 for prior nursing care, of which $34,097.35 has been paid by Mr. Allon, punitive damages, statutory interest in the amount of 18 percent and future costs of care.

Based upon the present facts of plaintiff's condition, a find is made in plaintiff's favor and an appropriate order is attached hereto.

## NONJURY VERDICT

And now, this June 3, 1985, upon the petition for declaratory judgment filed by plaintiff Natalie Ina Allon by her parent and natural guardian, Samuel Allon, for medical and hospital expenses under the No-fault Act and the insurance policy issued by defendant CNA Insurance Companies and its affiliates, the court finds in favor of plaintiff as follows:

1. Payment for skilled nursing services provided by Pittsburgh Nursing Specialists from September

1984 in the amount of $84,150 with credit for amounts paid.

2. Statutory interest in the amount of 18 percent as provided by the Pennsylvania No-fault Act.

3. Reasonable attorney's fees to be set forth in a petition to be filed by plaintiff's counsel based upon hours of service.

4. Matters related to a private room to be negotiated between defendant and Negley House and shall not be included within this order.

5. Plaintiff's request for punitive damages is denied.

6. Payments for skilled nursing care shall be paid by the defendant CNA until further order of court, but CNA contribution for the night shift (11:00 p.m. — 7:00 a.m.) may be limited to the hourly rate of a nurse's aide.